(109 App. Div. 361)

## O'CONNOR v. HENDRICK et al.

(Supreme Court, Appellate Division, Fourth Department.　November 29, 1905.)

1. SCHOOLS AND SCHOOL DISTRICTS—PUBLIC SCHOOLS—RELIGIOUS INSTRUCTION —CONSTITUTIONAL PROVISIONS.

The policy of the state to exclude religious denominational teaching from the public schools is shown by Const. art. 9, § 4, prohibiting the state or any subdivision thereof from giving aid to any school under the control of any religious denomination; article 8, § 14, permitting the expenditure of public money for the education and support of defectives and delinquents in hospitals under private or public control, not being applicable to the public schools.

[Ed. Note.—For cases in point, see vol. 10, Cent Dig. Constitutional Law, § 34½; vol. 43, Cent. Dig. Schools and School Districts, § 337.]

2. SAME—STATE SUPERINTENDENT—POWERS—PROHIBITING TEACHERS WEARING GARB OF RELIGIOUS ORDER.

Consolidated School Law, Laws 1894, c. 556, tit. 1, § 8, providing that the superintendent of public instruction shall visit the common schools and advise the pupils, teachers, and officers; section 9, requiring him to make to the Legislature an annual report containing plans for the improvement of the schools; section 13, authorizing him to remove from office any school officer disobeying any regulation adopted by him; section 14, requiring him to transmit to the school officers information deemed conducive to the proper management of the schools; and title 14, providing for appeals to him from any decision concerning matters pertaining to the common schools and requiring him to decide the same— authorize the superintendent to direct that the garb worn by a religious order shall not be worn by the teachers in the public schools, and that the same shall be discarded by them or they shall be dismissed as teachers.

3. SAME—DISOBEDIENCE OF ORDER OF SUPERINTENDENT—EFFECT.

Disobedience of the order of the superintendent of public instruction directing that a teacher wearing the garb peculiar to a religious order shall not be employed by a trustee of a school district, or, if employed, shall be dismissed unless she discontinues wearing the garb, renders the trustee liable to removal and deprives the teacher of the right to compensation.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Schools and School Districts, §§ 133, 290.]

4. SAME—RELIGIOUS INSTRUCTION.

A teacher in a public school wore the garb of a Catholic religious order to which she belonged. Immediately before the regular time for opening the school, and at the close of the morning and the afternoon sessions, she said the prayers of the Catholic Church. The Catholic children were required to be present at the prayers, while non-Catholic children were allowed to be absent. *Held* to constitute religious teaching, within Const. art. 9, § 14, prohibiting the state or any subdivision thereof from giving aid to any school under the control of any religious denomination.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Schools and School Districts, § 337.]

96 N.Y.S.—11

5. SAME—TEACHERS—CONTRACT OF EMPLOYMENT—VALIDITY.

A contract for the employment of a teacher in a. public school bound by her vows to wear the garb of a Catholic religious order to which she belongs, entered into in disobedience of the orders of the state superintendent, is invalid and nonenforceable.

Nash, J., dissenting in part.

Appeal from Trial Term, Livingston County.

Action by Nora O'Connor against Patrick Hendrick, as sole trustee of school district No. 9, town of Lima, Livingston county, and others. From a judgment granting insufficient relief, plaintiff appeals. Affirmed.

See 86 N. Y. Supp. 1.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and NASH, JJ.

Timothy J. Nighan and John D. Lynn, for appellant.

Fletcher C. Peck, Albert H. Stearns, and Walter H. Knapp, for respondents.

WILLIAMS, J. The judgment should be affirmed, with costs. The action is to recover the wages of plaintiff and her assignor as teachers in a public school, under contracts with the defendant trustee. The other defendants, taxpayers of the district, were brought into the action by reason of the relations between the teachers and the trustee, and the fear that the action would not be properly defended by the trustee alone. The defense to the plaintiff's claim, in brief, is that the contracts of employment are invalid, because made in violation of the orders and instructions of the state superintendent of public instruction, and that no recovery can be had for the services rendered, because, while acting as teachers, the plaintiff and her assignor refused to comply with and disobeyed the orders and instructions of the superintendent. The controversy arose with reference to the wearing by these teachers, in school, of the garb of a religious order. That the contracts were made, and the services were rendered thereunder, for which the recovery is sought, are facts not in dispute. The affirmative defenses raise the questions here involved. There is no dispute about the facts, but there are serious contentions over the law, involving the power and authority of the superintendent of public instruction and the binding force of his orders, instructions, and decisions.

It may be well in the first instance to get a full and correct statement of the facts, so far as the record before us shows. This school district comprises within its boundaries the village of Lima and some other portions of the town of Lima. It has about 1,000 inhabitants and about 200 children of school age. It has but one schoolhouse, a one-story brick building with but two rooms, having a seating capacity of about 76 scholars. It was built in 1860. This schoolhouse is inadequate for the accommodation of the school children of the district. The assessed valuation of the taxable property of the district is about $551,000, and yet the district, instead of enlarging its own school building or constructing a new one, has for years leased for school purposes a brick building known as "Brendan Hall"; the latter owned by the Roman Catholic Church at Lima. For many years prior to 1901 mem-

bers of the order of Sisters of St. Joseph, hereinafter described, had been employed to teach in that part of the public school conducted in Brendan Hall. In August, 1901, Sylvester, then trustee of the district, employed this plaintiff and one Miss Dougherty as teachers in that hall. They were both members of said order. In April, 1902, Ferris and other taxpayers of the district appealed to the state superintendent from the action of Sylvester, trustee, in leasing Brendan Hall for school purposes and in employing plaintiff and Miss Dougherty, members of said order, as teachers therein, wearing the garb of their order. The superintendent decided that the leasing of the hall was illegal, and that it was the duty of the school authorities to require the teachers to discontinue wearing the garb of their order while teaching in the school. For this latter decision he cited decisions made as far back as 1887, by Superintendent Draper, and as late as 1898, and then ordered that the trustee, Sylvester, require all teachers employed by him in the schools to discontinue wearing in school the distinctive or distinguishing garb or dress of the religious order, society, or sisterhood of which they are members, and that he be restrained from leasing or using Brendan Hall for school purposes. This decision and order was made June 5, 1902, and was filed with the district clerk. In August, 1902, at the regular school meeting, one Gordon was elected trustee. He declined to serve, and then the defendant Hendrick was elected at a special meeting and accepted the office. He was a Roman Catholic. He knew of the Ferris-Sylvester decision, and understood what it was. He says he knew that Sylvester was prohibited by the superintendent from employing teachers who wore the garb of their order, but did not know that he (Hendrick) was; that he made up his mind that the decision only applied to Sylvester, and not to him (Hendrick), and so he made these contracts with the plaintiff and her assignor in September and October and directed them to teach in Brendan Hall, and they went to work. They did not teach long in that building, but were removed by Hendrick to the school building owned by the district, stating to them that their certificates provided they might teach in a public school building. There were only four teachers in all, these two Catholics and two non-Catholics. The latter were removed to Brendan Hall when the former were removed to the school building owned by the district. The two Catholic teachers had always before that taught in Brendan Hall. When the contracts were made between Hendrick and plaintiff and her assignor, they knew the Ferris-Hendrick order had been made, and its contents. Very soon after the contracts were made, Bates, a taxpayer, took appeal to the state superintendent from the action of Hendrick in leasing Brendan Hall for school purposes and in employing the plaintiff and her assignor as teachers in the district. Hendrick answered the appeal, and the superintendent, May 28, 1903, made his decision therein, which was filed with the clerk of the district. In that decision the superintendent referred to his former decision and order in the Ferris and Sylvester case, and to many other decisions by himself and former superintendents, and to the Constitution of the state, and, among other things, ordered that Hendrick at once notify plaintiff and her assignor to forthwith discontinue the wearing in school of the distinctive dress or garb of the religious

order or sisterhoood to which they belonged, and, if they refused to
obey this requirement, that Hendrick at once dismiss them as teachers
in the school, and that Hendrick be enjoined from using any part of
the school funds in payment of the wages of such teachers, that Hen-
drick take steps to procure the enlargement of the present school build-
ing or the construction of a new one of sufficient capacity to accom-
modate the school children of the district, and that Hendrick report his
action under the order. This order was brought to Hendrick's atten-
tion, and he made known the contents thereof to the plaintiff and her
assignor. He did not dismiss the teachers, but permitted them to, and
they did, continue to teach the remainder of the time covered by their
contracts, wearing the same dress and garb of their order which they
had theretofore worn.

These teachers were members of a Catholic order known as the "St.
Joseph's Congregation," and had been for many years. They were
called "Sisters of St. Joseph," and their titles were, the plaintiff "Sister
Prudentia," and her assignor "Sister Teresita." The by-laws and
rules of the order provided that their habit should resemble the dress
of humble widows, made of common woolen stuff of a black color;
that the body of the dress should be perfectly plain, as also the sleeves,
which should extend to the end of the hand; that the skirts of the dress
should not reach quite to the ground, and their shoes should be plain
black; that they should wear a band of white linen across the fore-
head, a plain white linen cap fastened under the chin, and another cap
of black woolen stuff, with a veil of the same material; that they should
wear a crucifix of brass, attached to the neck, which should hang before
the breast, and that they should wear a pair of black beads, attached
to the left side of their cincture or cord; that they should not take off
their dress during the day, either on account of their work or of the
heat of the day, except that in sickness they could use a dressing gown,
which should be of the same material as their usual habit. · The by-
laws and rules of the order also provided that after two years of noviti-
ate the sisters should make the then simple vows of poverty, chastity,
and obedience, by which they gave up all that they had and all that they
were; that the vow of poverty disqualified them from having the right
to anything, and consequently they could not, under any pretext what-
ever, give away or receive anything without permission of the Superior,
and, if they accepted anything, they should place it at the disposal of
the Superior, to be employed as she should judge fit; that they should
not make use of the word "mine" when speaking of anything which
they used, but always the word "our"; that the Superior should pro-
cure and furnish all the sisters whatever should be required for diet
and dress, in health or sickness; that no sister should go out of the
house without another sister or person of the house accompanying her,
and when abroad the sisters should walk with great modesty, with
downcast eyes, and not separate from one another; that they could take
a walk in the suburbs of the town once a week, and should go by twos
or fours, but should never choose places much resorted to by the world;
that they should love holy retirement, and fly, as much as possible, all
commerce with persons of the world, and never go among them unless
obedience, necessity, or charity oblige them to it. In taking the habit,

the sisters pledged themselves to wear it with devotion, and to live and die in the exact observance of the rules prescribed for the sisters who wear the habit.

The plaintiff and her assignor, during all the time they were teachers in this school, wore this habit, and were bound to, and did, conform to the rules of this order. They were called by their names, Sister Prudentia and Sister Teresita. The term "Miss," or "teacher," was never used. They could only engage in teaching by permission of their Mother Superior, and she did consent and send them to render such service. The contracts must have been made by them with her consent and by her discretion, and the wages, when paid or received, must under the rules go at once to the Mother Superior, for such use in the order as she chose to make of them, under the direction of the Bishop or spiritual father in the Catholic Church. During the time the plaintiff and her assignor were engaged in teaching in this school they held morning, noon, and evening prayers of the Roman Catholic Church in schoolrooms, just before the opening and just after the closing of the morning sessions, and just after the close of the afternoon sessions of the school. The Catholic children were required to be present at these prayers. Non-Catholic children were allowed to be absent if they desired. The prayers were said by the teachers and participated in by the Catholic children and others who desired.

This gives a pretty correct statement of the facts appearing upon the trial of this case, as shown by the record before us. There are some other undisputed facts found by the court, which need not be recited here. The trial court held that the state superintendent had power under the consolidated school law of the state to determine the questions and make the orders contained in the Bates-Hendrick appeal, and that the same was final and conclusive, and therefore the plaintiff could only recover for the services to the time plaintiff and her assignor were notified of that decision and the orders contained therein. Judgment was directed accordingly, and Hendrick was given costs against the plaintiff; she receiving less than $50. The defendant taxpayers were given no costs. The amount involved in this litigation is not large. The total amount of the wages was $621.20. There had been paid $542, leaving a balance of $79.20, for which the action was brought. The recovery was only $25.20 of this amount. The plaintiff lost her costs, and was charged the costs of the defense. The litigation is more important by reason of the principles involved than by reason of the moneys sought to be recovered.

We think that the state superintendent of public instruction had power to instruct, direct, and order that this garb should not be worn by these teachers in the schoolroom, that it should be discarded by them, or they should be dismissed as teachers by the trustee. The trial court was careful to deprive them only of wages from the time they were notified of this requirement and disobeyed the same. The requirement was announced through the medium of the decision in the Bates-Hendrick case. This appeal was taken after the contracts with these teachers were made. The trustee was the person the superintendent was dealing with. The appeal was directed against him and his action as trustee, and the decision was to compel him to act, and to restrain

him in the use of public moneys. It did not have the force of a decision in the ordinary sense of the term against these teachers. They were not parties to it, and it did not direct them to do anything. To them it had the force only of instructions and directions from the superintendent of public instruction for the government of this school and their future conduct as teachers therein. So that the real question here is whether he had authority to give such instructions and directions, and whether disobedience thereof is a defense to an action to recover their wages for the time such disobedience continued. It involves, also, the question whether these contracts, in view of former decisions and orders made by the superintendent and known to these contracting parties, were valid and binding contracts. It is a matter very simply stated, but the solution of it is of considerable importance to those interested in the public schools of the state. It relates to the introduction into the public schools of religious teachings, denominational in character. The policy of the state is to exclude religious denominational teaching from the public schools of the state. Article 9, § 4, of the Constitution, provides:

"Neither the state nor any subdivision thereof, shall use its property or credit or any public money, or authorize or permit either to be used directly or indirectly in aid or maintenance, other than for examination or inspection, of any school or institution of learning, wholly or in part under the control of any religious denomination, or in which any denominational doctrine or tenet is taught."

The only exception to this provision is that contained in article 8, § 14, which permits moneys to be expended for the education of the blind, deaf and dumb, and juvenile delinquents, and for the care, support, maintenance, and secular education of inmates of orphan asylums, homes for dependent children, or correctional institutions, etc. This exception is in no way applicable to the public schools of the state. The public at large object to the introduction of religious teaching in the common schools. There are very many religious denominations in the state, and each denomination, while respecting the views of all others, and regarding all alike as entitled to entertain and teach their own peculiar religious doctrines, while they regard all other denominations as good Christian people, yet, believing their own to be the true religious belief, desire to bring up their children in such belief, and object to their being instructed in the peculiar belief and practice of other denominations. They particularly object to being compelled to submit their children to the teachings of other denominations than their own. This is especially true as between the Protestant denominations and the Catholic Church. There is no subject upon which the people at large are so sensitive as religion. It is a condition, not a theory, which confronts us. Wars have resulted from religious controversies, families have been separated by it, and quarrels over it have estranged neighbors and friends. Religion may be taught in the homes and in the churches and their Sunday schools and in private schools conducted by the various denominations, and no feeling is thus raised between the various denominations. The public schools, however, are created and conducted for the benefit of the whole people of the state and the children of all denominations of religious people. All are gathered to-

gether in these schools, and a large proportion of the children of the state, especially of the poorer classes, must be educated in these schools, if at all. Their parents cannot, or are not inclined to, send them to private schools, and education is made by statute compulsory. The children must be sent to school. It is therefore quite apparent that the policy of excluding religious teaching from the common schools of the state is not only embodied in the Constitution and the laws of the state, but is the only safe and reasonable policy to be adopted. Religion and religious teaching must be excluded from the common schools. There should be no difference of opinion upon this subject among the good citizens of the state. How is this to be accomplished? Evidently it must be done by those who are intrusted with the management, the control, and the supervision of the common schools.

The Constitution of the state (article 9, § 1) directs that:

"The Legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of the state may be educated."

Under the authority thus conferred the Legislature enacted the consolidated school law. Chapter 556, p. 1183, Laws 1894. That law provided for the superintendent of public instruction and prescribed his general powers and duties. While it is nowhere provided in express terms that he shall have general supervision of the common schools of the state, not only the nature of the office would so imply, but this implication may be drawn from various provisions of the law. Section 6 of title 1 of the act provides that:

"He shall also have general supervision over the state normal schools," etc.

Section 8 provides that he shall visit the common schools, inquire into their course of instruction, management, and discipline, and advise the pupils, teachers, and officers thereof. Section 9 provides that he shall annually report to the Legislature all plans and suggestions for the improvement of the schools and the advancement of public instruction in the state as he shall deem expedient. Section 13 provides that for willfully disobeying any decision, order, or regulation of the superintendent he may remove any school officer from his office. Section 14 provides that he shall cause such information and instruction as he should deem conducive to the proper organization and government of the schools and the due execution of their duties by school officers to be transmitted to them. And then title 14 provides for appeals to the superintendent from any official act or decision concerning any matter pertaining to common schools, and that the superintendent, upon such appeals, shall examine and decide the same, and his decision shall be final and conclusive, and not subject to question or review in any place or court whatever.

We cannot doubt but that the duty and authority of the superintendent extends to the giving of any instruction and the making of any order and decision with reference to the proper conduct of common schools, including the employment of proper teachers therein. It must be within his power to prevent the open and persistent teaching of religious denominational doctrines and tenets in the schools. This is something that we must regard as in violation of the Constitution, because the moneys of the state cannot in that event be used to support

the schools, and largely such is from the moneys of the state. Such teaching in the schools would therefore be illegal, and the employment of teachers who persisted in such teaching would be wrongful, and would not only subject the trustee to removal, but would render the contract for the services of such a teacher illegal and void. Certainly, if an order was made that such a teacher should not be employed by a trustee, and, if employed, should be dismissed unless she discontinued such improper conduct in teaching, a disobedience of such order would render the trustee liable to removal, and would deprive the teacher of the right to compensation for her services. These propositions seem so reasonable and apparent as to need no authority or argument to sustain them.

This leads us to the important question in this case, whether the wearing of this garb in question, under the circumstances, was not at least a part of a scheme for the teaching of the Catholic religion in this school. It seems to have been considered for many years by the superintendents of public instruction in this state that is was improper to wear such a garb in these schools, and that the superintendent had power and authority to prohibit its use. See decisions No. 3,250, March 24, 1887, Colt v. Suspension Bridge Dist.; No. 4,516, November 25, 1896, Durant v. West Troy Dist.; No. 4,546. May 15, 1897, Kennedy v. Watervliet Dist.; No. 4,642, March 31, 1898, Lockwood v. Corning Dist.; No. 4,722, December 23, 1898, Keyser v. Poughkeepsie Dist.; No. 5,010, June 2, 1902; Ferris v. Lima Dist.

In determining this question we should consider all the circumstances surrounding the school and the teacher and the scholars. The garb was a peculiar one, of black, plain material, with white linen bands about the forehead, over the head, and under the chin, and a black cap and veil over all, a brass crucifix hanging from the neck, and black beads at the side. This was the garb of a Catholic religious order, and the sisters were never to be during the day without it. They were governed by rules providing vows of purity, chastity, and obedience. They were to be always poor, have absolutely nothing, surrender all they had or should receive to the order, the Mother Superior, and to have their diet and dress provided for them. They were never to marry, or to assume the relation of wife or mother. They were to obey the order and the church implicitly in all things. They were never to go upon the streets unattended, and were not to walk in places frequented by other people, and then to walk with downcast eyes. They were to love holy retirement, avoid as far as possible all people of the world, not go among them unless obedience, necessity, or charity obliged them to. They were ordered by the Mother Superior to teach in this school, and all their wages were to be delivered to her. They were always addressed as "Sisters," never as "Misses" or "teachers." The first thing done when they went to the school house in the morning was the saying of prayers of the Roman Catholic Church. This was immediately prior to the regular time for opening the school, and though Protestant children were not required to join with Catholic children in saying the prayers with the Sisters, the time was such that the Protestant children would ordinarily be present in the room or waiting outside in the heat or the cold, the rain or the storm, and this service

would naturally be more or less viewed and listened to by such Protestant children. This service was repeated both at the close of the morning and afternoon sessions of the school, and though the Protestant children might go out if they desired and not take part in them, parents would not ordinarily desire that their young children, especially daughters, should be left to exercise their own discretion as to leaving or remaining and taking part in the services. Then all through the school hours these teachers, in this peculiar garb, and with their peculiar, modest manners and downcast eyes, were before the children as object lessons of the order and church of which they were members. It is within our common observation that young children, especially girls, are very susceptible to the influence of their teachers and of the kind of object lessons continually before them in schools conducted under these circumstances and with these surroundings. An effect is almost sure to be produced upon more or less Protestant children by these things. Even the children of Catholic parents are greatly influenced by such surroundings. And is it to be held that Protestant parents must send their children to public schools and submit to their young minds being influenced by these surroundings, and an effect produced upon them that may last during all their future lives? Teaching may be much more effective with young children by these surroundings and influences than by verbal or printed lessons.

It seems to us these sisters should never be permitted to teach in our public schools. From the very nature of their vows and lives, they should not be permitted to have the care and instruction of young persons, without the free consent of their parents. Catholics may consent to it. Protestants will not and do not consent to it. The sisters cannot teach without these garbs, because their vows and pledges prevent it. They must wear them always in the schoolroom. They are not proper teachers in the common schools, where Protestants as well as Catholics are practically compelled to send their children, many of them for the only education they can ever have. There seems to be a persistent effort in this school district to continue sisters of this Catholic order as teachers. The superintendents have held for years this garb shall not be worn in the public schools of the state. The superintendent held, in an appeal from this very district and as to one of these teachers, this same thing. That was in the Ferris-Sylvester case. The people had submitted for years to a condition of things which they were bound to break up. Hendrick was elected trustee. He was a Catholic; and in defiance of the orders of the superintendent he made these contracts. The teachers and their Mother Superior, whom they were pledged to obey, and who was to receive the fruits of their labors, knew as well as Hendrick what the orders of the superintendent were. These contracts were invalid and illegal, because they all knew the sisters must wear the garbs if they taught at all. Their vows required it; they would keep such vows. Under these contracts the plaintiff and her assignor acquired no rights which they could enforce. The plaintiff was not entitled to recover anything here. She was awarded $25.20, however, and no appeal has been taken by the defendants. The judgment must be affirmed, therefore, as it is.

Judgment affirmed, with costs. All concur, except HISCOCK, J., who concurs in the result, and NASH, J., who dissents in an opinion.

NASH, J. (dissenting). I fully concur in the proposition that the policy of excluding religious teaching from the common schools is embodied in the Constitution and the laws of the state. The saying of prayers of the Roman Catholic Church by the plaintiff and her assignor in the morning, at the noon hour, and at the closing of the school in the afternoon, in which the Catholic children were required to join and the Protestant children were permitted if they desired, but were not required, to be present, was within the inhibition of the Constitution and a violation of the provision that:

"Neither the state nor any subdivision thereof, shall use its property or credit, or any public money, or authorize or permit either to be used directly or indirectly in aid or maintenance, other than for examination or inspection, of any school or institution of learning, wholly or in part under the control of any religious denomination, or in which any denominational doctrine or tenet is taught."

The wearing of the distinctive dress or garb of the religious order or sisterhood to which the plaintiff and her assignor belonged in school hours was an object lesson which had a tendency to make an impression upon the minds of the children and to render them susceptible to the influence of their religious teaching; certainly the Catholic, if not the non-Catholic, children. We can make no distinction in this respect, whether the children are Roman Catholic or Protestant to whom religious teaching is imparted in the common schools. It is as much a violation of the constitutional provision to instruct one class of children as the other in the denominational doctrine or tenet of any religious denomination. It is within the general powers and duties of the superintendent of public instruction to prevent the open and persistent teaching of religious denominational doctrines and tenets in the schools, or the use of the school buildings at any time for such purposes, and therefore within his power and authority to make and enforce the order requiring Hendrick, as trustee of the school district in which the plaintiff and her assignor were teaching, to notify and require them to discontinue the use and wearing by them during school hours of the distinctive dress or garb of the religious sect or order to which they belong or of which they are members, and, in the event that after such notification and requirement they refused to comply therewith or obey such requirement, that said trustee forthwith dismiss the plaintiff and her assignor, Nora O'Connor and Elizabeth E. Dowd, as teachers in said public school. Indirectly this matter is entirely within the control of the superintendent. He could have canceled the certificate of the plaintiff and her assignor under the authority given him by section 12 of the consolidated school law, and in that manner enforce his order. He could also, under the authority conferred upon him, remove the trustee for his neglect or refusal to perform the duty enjoined upon him by the order.

I can find no authority for the further order of the superintendent enjoining and restraining the trustee from paying the plaintiff and her assignor for their services as teachers during the time they were actually

employed. His authority over the public money of the state is given by section 14 of the school law, which provides that the superintendent may withhold any share of the public money of the state from any district for willfully disobeying any decision, order, or regulation of the superintendent pertaining to the common schools. The power over the public money given to the superintendent does not affect the liability of the school district upon the contracts made by its trustee with the plaintiff and her assignor. The contracts made with them by the trustee are enforceable, and the rights of the parties are the same as in case of any other contract of employment. If they gave sufficient cause, they could, as the superintendent directed, be dismissed. They held certificates qualifying them as teachers, one given by the superintendent to the plaintiff after his predecessors in office had in several instances by their decisions held that it was improper for teachers to wear the prohibited garb in the schools, in which it was duly certified as follows:

"I hereby certify that Nora O'Connor has furnished sufficient evidence of successful experience in teaching and satisfactorily passed the examinations prescribed by law, and is duly qualified by learning, ability, and moral character to pursue the profession of teaching. She is therefore by this instrument licensed for life to teach in any public school in the state of New York, without further test or examination."

The objection is not to their competency or the qualification of the plaintiff and her assignor as teachers in the public schools. It is to the objectionable methods adopted by them in conducting the school, their religious exercises, and the wearing of the distinctive garb of their order. Their competency and qualifications as teachers, and their competency to contract, was settled and determined by their certificates, and therefore their right to recover for their services actually rendered rests upon the principles applicable to contracts generally. That part of the judgment which provides "that the plaintiff and Elizabeth E. Dowd, her assignor, are not entitled to recover for their services as teachers, under their contract with Patrick Hendrick, as such trustee, rendered by them during the three weeks they taught after they were notified of the decision of the superintendent of public instruction," is erroneous.

The judgment should be reversed.